| | |
|---|---|
| **UNITED STATES DISTRICT COURT**<br>**MIDDLE DISTRICT OF FLORIDA**<br>**FORT MYERS DIVISION** | |
| **KIMBERLY PERRY,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**WALMART, INC., WAL-MART ASSOCIATES, INC. AND WAL-MART STORES EAST, L.P.,**<br><br>    **Defendants.** | **Court File No.:  2:18-cv-606-FtM-29CM**<br><br><br>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Plaintiff, Kimberly Perry submits the following memorandum in opposition to Defendants' Motion for Summary Judgment (Doc. 43) and states the following as the basis for denial of the motion:

## I.    SUMMARY OF ARGUMENT

Plaintiff, in her extensive deposition testimony and in her declaration filed before this Court, details exhaustively the discrimination based on sex, the hostile work environment and retaliation that occurred during her employment by the Defendants.  While Defendants dispute that they engaged in such conduct, the evidentiary record supplies sufficient evidence of Defendants' unlawful conduct, such that there are material issues of fact between the parties that preclude entry of summary judgment.

1

## II.    **FACTUAL BACKGROUND**

Plaintiff is a forty-three year old woman who was employed by Defendants at the Distribution Center in Arcadia, Florida (the "Facility"). *Declaration of Kimberly Perry*[1] at ¶1-2. The Facility is essentially a large distribution and warehouse facility in which large trucks pick up and deliver Walmart retail merchandise for Walmart retail stores in the area.  KPD, ¶3.  The Facility employs 892 personnel, of which only 80 are female.  *Deposition Transcript of Carla Colon Corporate Designee of Walmart dated September 26, 2019*[2], 56:21-25.  The asset protection department ("AP"), where Plaintiff was employed at the time she was terminated was overwhelmingly male.  KPD, ¶3; CCT1, 47:10-17.

Plaintiff transferred into AP in August 2009.  KPD, ¶7.  During the course of her employment as an AP associate, she was subjected to sexual harassment, hostile work environment and discrimination based on sex.  KPD, ¶7-8.  Plaintiff suffered sexual harassment at the hands of truck drivers and others with whom she was required to interact as part of her duties.  KPD, ¶11-12.  Plaintiff reported the instances of sexual harassment to her superiors at Wal-Mart, who did little to protect Plaintiff from such conduct.  KPD, ¶11.

In December 2009, Plaintiff was subjected to a Greatwide driver making crude and offensive remarks of a sexual nature directed to Plaintiff.  KPD, ¶10.  The driver took pictures of Plaintiff's rear end without her permission.  Id.  Another driver from the same company assaulted Plaintiff using an air pump.  Id.  Plaintiff reported the incident contemporaneously to her superior, Larry Boudreaux.  Id.  In her letter dated December 6, 2009, she noted that "this is not the first time a Great Wide associate has attempted to take my picture."  KDP, ¶10, Ex. A.

---

[1] Hereinafter referred as "KPD, ¶__ "
[2] Hereinafter referred to "CCT1, ___ "

Management claimed to be "unable to substantiate" her allegation and further did nothing to ensure that Plaintiff was protected from the conduct in the future.  Id.; *Declaration of Carla Colon*[3] at ¶4.

Over the years, Plaintiff was subjected to harassing remarks, unwanted sexual advances and other harassing conduct.  KPD, ¶11.  Although some of the incidents were reported in writing, they were too numerous and frequent to file written reports on all such incidents.  Id.  Plaintiff's experience as a female employee at the Facility was not unique.  Other female employees have reported sexual harassment by male employees, to which there was no or inadequate response by management.  KPD, ¶12-15.  Plaintiff has been told by her male managers, including Dana Harrington, and other male associates that a woman had no business working at the Facility because warehouse work was "a man's job not a woman's job."  KPD, ¶17.

As part of her duties as an AP associate, Plaintiff was required to interact with truck drivers delivering or picking up goods.  KDP, ¶18.  Because Plaintiff worked the overnight shift, these interactions happened during a time in which fewer personnel were present.  Id.  This presented safety issues with her interacting with the drivers who were predominantly male.  Id

On a number of occasions, Wal-Mart employees wrote obscenities on the trailers within the cargo bays directed at Plaintiff.  KPD, ¶19.  In and around September 2016, someone wrote the word "Koko," which Plaintiff later was told was slang for a black woman's vagina.  Id.  Defendants conducted an investigation, and concluded largely on the self-serving statement of the male associate who wrote them that he had written Koko on the trailers because it was the

---

[3] Hereinafter, referred to as "CCD, ¶__"

nickname for his son.  Id.; CCT1, 63:15-24.  After the investigation was concluded, Plaintiff continued to observe the word "Koko" on the trailers but at less frequency.  Id.   Later, she followed up with her supervisor, Dana Harrington about the problem.  Id.  Harrington belittled her and called her complaints "annoying" and called her a "troublemaker."  Id.  She initiated no further formal action about it based on the fact that in light of management's inaction, further pressing of the issue would be futile, and she did not want to be known as a troublemaker.  Id.

In December 2016, a driver grabbed Plaintiff and threatened to kidnap and sexually assault her.  KPD, ¶20.  Plaintiff timely reported the matter.  Id.  Nothing was done to address Plaintiff's work environment or her personal safety.   In fact, Plaintiff's supervisor, Dana Harrington, blamed Plaintiff herself, falsely stating that that she was "flirting" with the driver. Id. Around the same time, another incident occurred in which a driver grabbed Plaintiff and pull her towards him.  Id.  Both incidents were reported to her superior, Dana Harrington verbally.  Id.  In violation of Walmart policies and procedures, he did not elevate the complaints to his superiors. Id.; CCT1, Ex. 9 at 1024.

Ultimately, in February 2017, Plaintiff submitted a written complaint concerning the preceding events to Global Ethics at Walmart.  KPD, ¶21.  Plaintiff requested that Defendants take action to prevent the unwanted and harassing conduct, including installation of a barrier at the truck gate where she worked.  Id.  Management first refused to take any action, and delayed taking action for more than a year, and finally installed a barrier shortly before Plaintiff's termination in March 2018.  Id.

Harrington never took her complaints seriously, and indicated that she was just there to "look pretty."  KPD, ¶22.  In January 2017, after the quarterly AP meeting at the Red Lobster

restaurant in Port Charlotte, Florida, Plaintiff again expressed concerns to Harrington about the harassment and safety concerns she had about the truck gate.  Id.  Plaintiff proposed replacing the speed bump, more lighting, fixing the locks (which were rarely operational) or replacing the locks with combination locks and again proposed installing a protective barrier. Id.   In front of the entire AP department, Harrington mocked and belittled Plaintiff's concerns, stating that they were going to "seat her in front of the big lobster tank in the restaurant lobby and that will be [her] safety barrier." Id.  In February 2017, Harrington, in response to Plaintiff's complaints about the harassing interactions with the truck drivers, told Plaintiff about an upcoming weekend in which she would be off that "it's going to be the all men weekend because Kim won't be here, which is how it should be all the time, just men," implying that it was Plaintiff's sex that was the problem not harassment by others.  KPD, ¶23.

On March 23, 2017, Plaintiff made her first complaint about the hostile work environment at Walmart to the EEOC. KPD, ¶24.  On April 13, 2017, EEOC provided notice of the complaint to Defendants.  *Declaration of Christopher J. DeCosta[4]*, ¶2.   Thereafter, she submitted supplemental complaints, on December 17, 2017 and April 19, 2018.  KPD, ¶24.

In November 2017, Wal-Mart employee, Stephen Reeves made a number of harassing, sexually explicit and offensive remarks to Plaintiff, including the following:

    a.    Referring to sexual acts and asking if she liked it "sticky and icky"

    b.    "You wore me out last night"

---

[4] Hereinafter referred to as "CJD __"

c.      "now that the new windows have been put in and the drivers can no longer

get to [Plaintiff], the drivers are going to ask [Plaintiff] to put [her] titties

on the glass"

d.      "They need to call that perfume [Viva La Juicy Booty for that juicy big

old butt that you have"

KDP, ¶25.

Plaintiff complained about the preceding conduct to her supervisor, Dana Harrington and

through a written complaint to Global Ethics.  KPD, ¶26.  While Defendants eventually did take

disciplinary action against Reeves, later Harrington treated Plaintiff as if it was her that was the

problem.   Id.  This was due in large part to the fact that Harrington knew Reeves socially as a

friend, having attended/watched sporting events together, and their common roots in the same

community in Mississippi.  *Deposition Transcript of Dana Harrington*[5], 13:20 – 15:6.

After  Plaintiff  filed  her  formal  complaint  with  EEOC,  Walmart  began  to  take  petty

disciplinary actions against Plaintiff for conduct that would not ordinarily be actionable against

other  similarly  situated  employees. KPD,  ¶27.   For  example,  Walmart  initiated  disciplinary

action against Plaintiff for allegedly failing to timely complete her computer based learning on

time, which was not only false, but something for which other similarly situated employees were

not  typically  subject  to  discipline. Id.   Walmart  management  personnel  including  Dana

Harrington  and  Charles  Ratcliff  began  to  make  derogatory  references  about  Plaintiff  to  other

employees, such as that Plaintiff was lazy and that false statements about Plaintiff "never going

to work," which are completely belied by Plaintiff's consistently favorable performance reviews,

---

[5] Hereinafter, referred to as "DHT, ___"

and in part which refer in pejorative terms, Plaintiff's exercise of her rights under the Family and Medical Leave Act.  KPD, ¶28.

Regarding, the disciplinary action for failing to complete her computer based learning assignment, Plaintiff explained to her superiors that her computer was not downloading her emails, and had asked IT personnel with help in gaining access to her emails.  KPD, ¶27. Notwithstanding her reasonable explanation for her failure to complete the CBL, Defendants nonetheless took disciplinary action against Plaintiff.  Id.  Plaintiff, an employee of Walmart for more than 15 years at that point, had never heard of anyone being disciplined for such a minor issue, especially where the employee had a reasonable explanation.  Id.  On another occasion, Plaintiff was disciplined for clocking out early, when she had a documented emergency medical condition.  KPD, ¶29.

On or about January 15, 2018, a Marten driver grabbed Plaintiff without her consent and against her will.  KPD, ¶30.  This incident was reported to Walmart management.  Id.  Again, Wal-Mart management gave Plaintiff no support, and acted as if it was Plaintiff who was to blame for this clearly unlawful conduct. Id.

In February and March 2018, the hostile work environment became more intense and unpleasant for Plaintiff.  KPD, ¶31.  Unauthorized employees made comments referring to Plaintiff's complaints about sexual harassment and to the EEOC, which made Plaintiff's work environment even more unpleasant.  Id.  According to Defendants' emails, the situation with Plaintiff was being discussed at the highest levels of management of the Facility.  *Deposition Transcript of Carla Colon on December 4, 2019*[6], 22:3-12, Ex. 32 at 1350.

---

[6] Hereinafter, referred to "CCT2, ___"

In February 2018, Wal-Mart claimed that Plaintiff had used inappropriate language in the Facility cafeteria on February 26, 2018.  KPD, ¶32.  Defendants contend that she "screamed" profanity ("asshole" or "fucking asshole") in the cafeteria.   CCD at 17.  Plaintiff, Dana Harrington and Defendants' corporate designee, Carla Colon, testified that profanity is used in the Facility.  CCT1, 48:14-18; DHT, 24:4-8; KPD, ¶32. According to Plaintiff, profanity was often heard.  While Walmart purportedly frowns upon the use of profanity by its employees, neither Plaintiff nor Harrington had ever heard of anyone being disciplined for using profanity. KPD, ¶32; DHT, 30:22-24. No one testified that they had ever heard Plaintiff use profanity.

 A period of more than seven days elapsed from the time the incident allegedly occurred and Defendants decided to investigate and pursue discipline against Plaintiff.  KPD, ¶33. Defendants claim they received an "open door" complaint about Plaintiff, yet they cannot actually identify the person who actually made the initial complaint.  CCT2, 10:20 – 11:15. Walmart claimed Plaintiff screamed the words "asshole" or "fucking asshole" directed to Tyler Jansen, a cafeteria employee.  CCT2, Ex 32 at 1357-1362.  Five witnesses were identified, Plaintiff, Trevor Dillon, Blake Badinovic, Casady Lane and Jansen.  Id.

In her interview by Walmart representatives, Plaintiff denied that she ever used profanity in the cafeteria.  CCT2, Ex. 32 at 1364.  Jansen, for his part, did not say Plaintiff used profanity, and told Walmart representatives Plaintiff told him "it was ridiculous that she had pre-ordered." CCT2, Ex. 32 at 1361.  Casady Lane inexplicably either was not asked to provide a statement or such statement has been lost or destroyed.  CCT2, 12:3-25. Defendants did obtain statements from Dillon and Badinovic.CCT2, Ex. 32 at 1357-1362.  Dillon had been the subject of the prior investigation involving the writing on the trailers and had animosity towards Plaintiff. KPD, ¶33.

The cafeteria where the incident occurred was subject to video surveillance.  CJD, Ex. 2. However, with legal action pending, Defendants appear to have destroyed the video.  Id.  Given the suspicious circumstances surrounding the disciplinary action of Plaintiff, it is fair to infer that the video was exculpatory.  At worst, it could have provided confirmation as to whether the version of events reported by Dillon and Badinovic was accurate.

On March 11, 2018, notwithstanding the fact that no one had ever heard of an employee being disciplined for using profanity, with multiple EEOC complaints having been made over the preceding 12 months, and having been identified as a troublemaker by her supervisor, Defendants suspended Plaintiff without pay and removed her from the AP department.  KPD, ¶34; CCT2, Ex. 32 at 1342.  As such, to obtain a new position at Walmart, Plaintiff would have had to look for a new job outside of AP, which would have been futile given the magnitude of her discipline.  KPD, ¶34. As such, in light of the continued hostile work environment, and her loss of employment income, Plaintiff was forced to resign and obtain alternative employment to support herself and her children.  KPD, ¶35.

In its disciplinary action essentially terminating Plaintiff, Defendants self-serving recast its claim as one of "ethics" instead of merely use of profanity "asshole" in a warehouse setting. In other words, Defendants assert that they did not suspend Plaintiff without pay because she *said* the word "asshole" in a warehouse setting but because she *lied* about saying the word. CCT1, ¶17-18.  This strained construction fails to meet the most generous standard of credibility.

In addition to being suspended without pay in retaliation for exercising her rights under the Civil Rights Act, Plaintiff suffered humiliation, embarrassment, depression and emotional distress caused by the hostile work environment, the sexual harassment—which was tacitly

permitted by management, and her termination.   KPD35-36 Plaintiff described the stress and

anxiety she suffered because of the environment at her deposition:

"Q.     When did the depression first start?

A.  With the job?

Q.     Yes.

A.  It was about the same time because I actually liked the job I was doing, and I had
hopes to move upon the position, As you see, I got promoted more than once.  So it was
depressing that I had to come to work and deal with this ongoing behavior from the
drivers.  And I felt like the lack of support was very discouraging.

***

Q.     Okay.  Now, during the time that you were feeling anxious and depressed – I
understand that you had bouts of, you know – you described it as bouts of anxiety and
depression.

A.     Yes.

Q.  During those time periods, was it affecting your daily life as far as outside Walmart?

A.     Well, it would, because obviously, you know, if I feel like – you know, if I go
home after one of the days where I was being harassed, I would go home and I would be
very upset.  I would feel sick and nervous.  And it would make anyone depressed to know
that a job they enjoy doing has become unpleasant."

*Transcript of the Deposition of Kimberly Perry*[7], 306:19 – 307:3 309:4-16.   There were times

Plaintiff missed work because of the stress and anxiety caused by the hostile work environment

at the Facility.  KPT, 327:1-6.

On April 17, 2018, she tendered her resignation to Walmart, citing the hostile work

environment as the basis for her resignation, and making it very clear that she considered her

---

[7] Hereinafter, referred to as "KPT, __"

termination to be a constructive discharge. KPT, Ex. 20.  EEOC issued a notice of the right to sue prior the commencement of the instant action.  CJD, Ex. 2.

### III.   <u>CLAIMS</u>

Plaintiff, in her complaint of September 10, 2018, asserted the following counts:

I.     Discrimination Based on Sex (42 U.S.C. §2000-e2)

II.    Hostile Work Environment

III.   Violation of the Florida Civil Rights Act

IV.    Violation of Title VII-Retaliation

V.     Violation of Florida Civil Rights Act – Retaliation

VI.    Violation of the Family Medical Leave Act

VII.   Negligent Supervision, Retention and Training

### IV.   <u>STANDARD FOR SUMMARY JUDGMENT</u>

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, a party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Factual issue is "genuine" for summary judgment purposes if it may reasonably be resolved in favor of either party and, therefore, requires finder of fact to make choice between parties' differing versions of the truth at trial; by like token, "material" means that contested fact has potential to change outcome of suit under governing law if dispute over it is resolved favorably to nonmovant. <u>Rigau v. Pfizer Caribbean Corp.</u>, 525 F. Supp. 2d 272 (D.P.R. 2007).  The rule authorizing summary judgment should be cautiously invoked to the end

that parties may always be afforded a trial where there is a bona fide dispute of facts between them.  United Meat Co. v. R.F.C., 174 F.2d 528 (D.C. Cir. 1949) Credibility issues fall outside the scope of summary judgment.  Ruiz Rivera v. Pfizer Pharm. LLC, 463 F. Supp. 2d 163 (D.P.R. 2006).

## V.  ARGUMENT

Material issues of fact preclude entry of summary judgment on any of the claims asserted in the complaint.  Plaintiff asserts that she was subjected to adverse employment action on the basis of sex.  Plaintiff avers that she was subjected to disparate treatment, discrimination based on sex, and hostile work environment during her time of employment by Defendants.   In addition, she has asserted that she was injured by Defendants' violation of the Family Medical Leave Act.  Moreover, the facts established by Plaintiff meet a prima facie case for negligent supervision, training and/or retention.   While Defendants deny that this occurred, this is a classic "swearing contest" which requires a jury to assess the credibility of the parties.  As such, entry of summary judgment would be inappropriate.

### A. Plaintiff has Established a Prima Facie Case under Title VII and the Florida Civil Rights Act for Discrimination Based on Sex

Title VII of the Civil Rights Act of 1964 made it unlawful for an employer to discriminate against any individual "with respect to his compensation, terms, conditions, or privileges of employment" based on sex.  42 U.S.C. §2000e-2. The aforementioned text refers not only to tangible discrimination but also a "discriminatorily hostile or abusive environment." Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986).  A discriminatory hostile or abusive environment exists where the environment is "sufficiently severe or pervasive  as to alter the conditions of the victim's employment and create[s] an abusive working environment."  Id.

Under the 11th Circuit's standard for hostile work environment claims, the plaintiff must establish (1) that she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, or other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment  was sufficiently severe or pervasive to alter the terms and conditions of her employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.  Mendoza v. Borden, Inc. 195 F.3d 1238, 1245 (11th Cir. 1999).  Either severity or pervasiveness is sufficient to establish a violation of Title VII.  Id. see also Burlington Indus. v. Ellerth, 524 U.S. 742, 743 (1998).  Conduct may be actionable even if it is not directed specifically at the plaintiff.  Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 811 (11th Cir. 2010).  The underlying reasoning behind the jurisprudence in this area of the law rest up on the idea that "a member of a protected group cannot be forced to endure pervasive, derogatory conduct and references that are gender-specific in the workplace."  Id. at 810.

In the instant case, there is no dispute that Plaintiff, as a woman, is a member of a protected class.  Moreover, there is no dispute that Plaintiff, together with other female employees of the Facility, was subjected to harassment and "other conduct of a sexual nature."  The dispute, to the extent it may be gleaned from Defendants' filings before this court, is a disagreement about the magnitude of such conduct.

Plaintiff has affirmed that beginning from the time she transferred into AP in 2009, she was subjected to sexual harassment and other discriminatory conduct of a sexual nature.  While she has identified four specific instances in which she submitted *written* reports to management about harassing conduct, she is very clear that over the years, she experienced harassment on a regular basis, too frequent and burdensome to document and submit written reports each

instance.   With response to each of her written reports, the Defendants investigated the complaint, and made facial attempts at determining the perpetrator, the abusive conduct continued.  The hostile work environment persisted.

The written reports submitted by Plaintiff detail conduct that can only be characterized as abusive and/or severe.  There was the 2009 incident wherein men were taking photographs of her back side without her permission.  She reported the incident to her superiors, who allegedly attempted to determine the identity of the perpetrator but took no further action, and did nothing to address the problem.

Employees would write profane and sexist messages on the trailers knowing she could see them.  In 2016, Plaintiff complained to management about the word "Koko" being written on the trailers, which Plaintiff understood to mean "black vagina."  In response to the complaint, Defendants conducted a perfunctory investigation and determined based on the representation of the perpetrator that the word "Koko" referred to his son's nickname, not a vulgar reference to female anatomy.  Again, upon concluding that the allegation was unsubstantiated, Defendants took no action to address the greater issue: the abusive work environment for Plaintiff and other female employees at the Facility.

In December 2016, Plaintiff was assaulted and threatened to be abducted by a driver.  Her complaint was met with ridicule and disparagement by her supervisor, Dana Harrington and others.  Her request for the implementation of safety measures to protect Plaintiff from further sexual harassment was mocked at an AP meeting in 2018.  Plaintiff was subjected to explicit sexual harassment by Steven Reeves in November 2017—six months after Plaintiff had submitted a complaint concerning discrimination based on sex to the EEOC.  In January 2018,

14

Plaintiff was subjected to unwanted touching by a Marten driver.  Not long after Defendants closed their perfunctory investigation of this incident, they embarked on a pretextual investigation of Plaintiff's alleged use of profanity, which resulted in her unjustified suspension without pay.

The preceding conduct is manifestly pervasive and is some cases severe, and occurred frequently over a period of many years. While Defendants minimize Plaintiff's experience, they do not dispute that the events occurred.  As such, there is at minimum a factual predicate upon which a jury could conclude that the sexual harassment and other sexual conduct experienced by Plaintiff was pervasive or severe, and that it constituted an abusive environment.  Accordingly, there lies a material dispute of fact for which summary judgment would be inappropriate.

Finally, there is a basis to hold Defendants responsible for the acts of the named and unnamed managers at Walmart who fostered a hostile work environment at the Facility. Defendants do not dispute that they were Plaintiff's employer during the operative period. Federal law, based on general common law principles of agency, governs employer's vicarious liability under Title VII for sexual harassment by supervisor <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).  An employer may be liable for both negligent and intentional torts committed by an employee within the scope of his or her employment. <u>Id</u>. at 756.  An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.  <u>Id</u>. at 765.  Here, Plaintiff has plausibly established that her supervisors, including, but not limited to, Dana Harrington, were responsible for a hostile work environment at the Facility.  As such, Plaintiff has established a prima facie case of

discrimination based on sex due to the hostile work environment fostered by her superiors at the Facility.

In its Twelfth Affirmative Defense, Plaintiff raises as an affirmative defense to the prima facie case of discrimination based on sex, what is known as the Farragher/Ellerth defense. This defense, to the extent that it is applicable to Plaintiff's claims, requires the establish of the following by a preponderance of the evidence:

(1) That the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and

(2) That the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.

Farragher v. City of Boca Raton, 524 U.S. 775, 807 (1998) see also Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998).

Here, Plaintiff disputes that Walmart exercised reasonable care to prevent and correct promptly any sexual harassment. Indeed, while Walmart conducted perfunctory investigations to "substantiate" her allegations, it took no reasonable action to correct or disincentivize serial behavior that was pervasive at the Facility during the entire period she was employed in AP. While Defendants assert they had a discrimination and harassment policy prohibiting sexual harassment[8], there is no evidence in the record that it promulgated the policy to all of its employees. Moreover, the evidence is clear that management did not follow such policies and procedures. For example, the Walmart's Discrimination & Harassment Policy required that its managers "take appropriate action to eliminate conduct that violates this policy and to ensure that

---

[8] The mere existence of a grievance procedure and policy and failure to invoke the procedure in and of itself does not insulate an employer from liability. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57 (1986).

there is no recurrence of such conduct." Harassment Policy at 991.    It is clear that while Walmart may have performed an investigation of certain individual instances reported by Plaintiff (not all of them), it took no action to ensure a recurrence of the harassment.  As a result, the harassment persisted for years. Harrington and others violated the requirement that it immediately report and elevate violations to the appropriate upon being made aware of possible violations, and failed to make reasonable efforts to maintain the confidentiality of investigations into sexual harassment reported by Plaintiff.  Id.

Setting aside Defendants' failure to exercise reasonable care in preventing the hostile work environment, there is no evidence that Plaintiff failed to take advantage of corrective or preventive opportunities extended by Defendant.  Indeed, Plaintiff repeatedly reported violations both in writing and verbally to her supervisors and others.  Her report to EEOC was not made until she had exhausted efforts to convince her employer to address the widespread and constant hostile work environment.  Accordingly, the Farragher/Ellerth defense has not been established. Entry of summary judgment on Counts I, II and III of the Complaint would be inappropriate.

### B.  There are Material Disputes of Fact as to Whether Retaliation Occurred

Plaintiff has established that she was suspended without pay on March 11, 2018, while several EEOC complaints were pending, and only weeks after her complaint concerning sexual harassment was closed by management.  Plaintiff was suspended, removed from her position, and as such was, for all intents and purposes, fired at that time.  Defendants justify the firing based on their determination that Plaintiff used profanity in a warehouse setting.  Therefore, Defendants argue, the termination could not constitute retaliation under the Civil Rights Act of 1964 and the Florida Civil Rights Act.

A plaintiff alleging retaliation must establish a prima facie case by showing: (1) a statutorily protected expression, (2) an adverse employment action, and (3) a causal link between the protected expression and the adverse action. United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 716 (1983). Courts have recognized that in discrimination cases, an employer's true motivations are particularly difficult to ascertain. Id. Determining the motive of an employer presents problematic evidentiary issues in determining the employer's mental processes which most likely cannot be solved by eyewitness testimony. Id. As such, once a prima facie case is met, a summary judgment on the merits is "ordinarily inappropriate." Id. at 919.

There is no genuine dispute that by raising concerns about the hostile work environment and sexual harassment both with her employer and the EEOC, Plaintiff was engaged in a statutorily protected expression. There is similarly no genuine dispute that Plaintiff's suspension without pay was an adverse employment action as defined in 42 U.S.C. §2000-e. The question Defendants raise is whether there was a causal link between Plaintiff's complaints and her termination on March 11, 2018.

Based on a review of the summary judgment record, it is clear that Plaintiff has met her burden of establishing the requisite causal linkage. First, it should be noted that the burden of production establishing a causal link supporting retaliation is much less at summary judgment than it is at trial. Hairston v. Gainesville Sun Pub. Co., 9 F.3d 913, 920 (11th Cir. 1994). As part of this initial burden, plaintiff need only establish that "the protected activity and the adverse action were not wholly unrelated." Simmons v. Camden County Board of Ed., 757 F.2d 1187, 1189 (11th Cir. 1985). This burden is met by establishing that the employer was aware of the protected expression at the time it took the adverse employment action. Goldsmith v. City of

18

Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993).  Here, Plaintiff has established that Walmart knew of Plaintiff's complaints both to her employer and EEOC at the time they terminated her on March 11, 2018.  This is reflected by the existence of written complaints by Plaintiff that were contained within Defendants' records, and the fact that the EEOC notified Defendants in writing of the complaint by Plaintiff for the first time on April 13, 2017.  As such, Plaintiff's initial burden of establishing a prima facie case for retaliation is met.

Once the plaintiff establishes a prima facie case for retaliation, the burden of proof at the summary judgment stage is governed by the framework established in McDonnell-Douglas v. Green, 411 U.S. 792 (1973).  Once the defendant articulates a legitimate, non-retaliatory reason for the adverse employment action, the burden then shifts back to the plaintiff to raise a genuine factual issue as to whether the defendant's stated reason is pretextual.  Hairston, 9 F.3d at 920. Nonetheless, summary judgment is generally inappropriate on the issue of pretext where the plaintiff has established a prima facie case because of the "elusive factual question" involving motive in intentional discrimination cases.  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248. 256 (1981).

Defendants have stated that the reason for Plaintiff's termination was her dishonesty in responding to an investigation concerning her alleged use of profanity in the cafeteria, which they contend was a deviation from Defendant's Respect for the Individual Policy[9]. Notwithstanding the fact that summary judgment would be inappropriate here based on the initial showing by Plaintiff, and the quandary that determining intent at summary judgment stage presents, there is ample evidence in the summary judgment record on which the trier of fact could find Defendants stated reason for termination not credible and therefore pretextual.

---

[9] The text of this policy is not in the summary judgment record.

The incident in the cafeteria allegedly occurred on February 26, 2019, at a time after Plaintiff had made multiple complaints over a series of years about the hostile work environment at the Facility.   The investigation was commenced mere weeks after her January 16, 2018 complaint about the sexual harassment she suffered at the truck gate was closed.   CCT2, Ex. 32 at 1345.   The issues were not raised for more than a week after the event occurred.   At deposition, Defendants could not identify the person who complained about the use of profanity.

That Plaintiff's alleged use of profanity was a legitimate disciplinary inquiry is at best a dubious proposition.  Plaintiff testified that she heard profanity used at the Facility on a regular basis and had never heard of anyone being disciplined for such an infraction.  This was in part confirmed by Plaintiff's supervisor Dana Harrington.

Defendants claim that when a cafeteria worker told Plaintiff that they were out of a requested food item, she "became extremely agitated and began screaming and cursing at the young man."   CCD at ¶17-18.  Plaintiff denies that this occurred and that she used profanity at any time.   However, the statement provided by Tyler Jansen, the alleged victim of the alleged "screaming and cursing," provided a statement in which he made <u>no</u> <u>mention</u> of screaming or cursing.  In fact, the only words he stated that were said by Plaintiff was that "it was ridiculous that she had just preordered 10 minutes ago."  CCT2, Ex. 32 at 1361. When Jansen gave an explanation as to the unavailability of the meal, Plaintiff simply walked away.  Later, when Plaintiff returned to the cafeteria, Jansen apologized, and Plaintiff did not respond.

According to Defendants, there were three witnesses identified.   One of the witnesses inexplicably was not asked to provide a statement.  Of the other two witnesses, one of them, Trevor Dillon, was someone who had an axe to grind against Plaintiff, in that he had been

reported to management by Plaintiff, as someone who may have been responsible for writing sexual explicit messages on the trailers.   KPD, ¶32.   For some reason, Defendants chose to disregard the version of events given by the alleged victim, Jansen.

Defendants' version of events could have been easily confirmed or rebutted by review of the surveillance tape from the cafeteria.   The tape was the subject of a motion to compel before the court, and an order compelling production.   After refusing to produce the tape, and claiming a videotape was not a "document" subject to a request for production, and after being ordered to produce the tape, Plaintiff now claims that the tape was destroyed.   While Plaintiff's counsel claims that the videotape was "overwritten in accordance with Walmart's standard retention policies," the standard policy has not been produced despite requests by counsel, and a review of the policies and procedures Walmart managers are expected to follow suggests that a videotape of events relating to an investigation should be retained indefinitely until further notice.   CCT1, Ex. 14 at 978.

The fact of the matter is that there is plenty amiss with the circumstances surrounding the disciplinary investigation of Plaintiff's alleged use of profanity to raise serious question as to the credibility of Defendants' stated reasons for the termination.   As such, Plaintiff has demonstrated a genuine issue of material fact as to whether Plaintiff's termination was a pretext for retaliation for her complaints to management and the EEOC.   Accordingly, summary judgment on the retaliation claims would be inappropriate at this time.

### C.  Genuine Issues of Material Fact Exist as to Whether Defendant Engaged in Unlawful Retaliation under the Family Medical Leave Act

Plaintiff's claims for retaliation for her exercise of her rights under the Medical Leave Act are examined through the same framework as the Title VII discrimination claims set forth

above.   Plaintiff has established that she was terminated after the exercise of her rights to intermittent leave and that   This in and of itself establishes a prima facie case for discrimination based on her exercise of her rights under the Act.   Plaintiff's stated reason for the termination was that she violated the Respect for the Individual Policy.   For the reasons set forth above, and the fact that Plaintiff reported that she had been ridiculed by Harrington and others for being lazy and never working; clearly referring to her use of intermittent leave under the FMLA. Accordingly, there is a genuine issue of material fact as to whether Plaintiff's termination was pretextual such that summary judgment should be denied.

### D. Genuine Issues of Material Fact Exist as to Whether Engaged in Negligent Training and/or Retention

Plaintiff has offered no argument against the negligent retention or training claim and as such, the court should consider this claim outside of the scope of Defendants' motion for summary judgment.   Nonetheless, to state a cause of action for the tort of negligent hiring or retention, a plaintiff must allege that (1) the employee/contractor was incompetent or unfit to perform the work; (2) the employer knew or reasonably should have known of the particular incompetence or unfitness; and (3) the incompetence or unfitness was a proximate cause of the plaintiff's injury.   Gharfeh v. Carnival Corp., 309 F. Supp. 3d 1317, 1332 (S.D. Fla. 2018). Here, based on the summary judgment record, there is ample evidence showing that Walmart knew of the problems experienced by Plaintiff and other female employees at the Facility, and the incompetence of the managers, including, but not limited to Dana Harrington to take reasonable action to protect Plaintiff from the harassment and hostile work environment. Accordingly, Plaintiff has established a prima facie case for negligent retention or training.

## CONCLUSION

Plaintiff and other female employees of the facility suffered from an abusive environment that constitutes discrimination based on their sex.  Plaintiff acted reasonably in drawing her employer's attention to the humiliation and abuse she suffered from those within Defendants' control and requesting that prompt action be taken.  Defendants failed to act promptly to address these issues and instead fired Plaintiff, who until her termination had an exemplary record, for use of profanity in a warehouse environment where profanity is often heard and tolerated. Plaintiff has established a prima facie case for discrimination based on sex and retaliation under the Civil Rights Act of 1964, the Florida Civil Rights Act and the Family Medical Leave Act. As such, summary judgment should be denied.

Dated this 7th day of February, 2020.

By: ___/s/ Christopher J. DeCosta_____
**CHRISTOPHER J. DECOSTA, ESQ.**
Florida Bar No.:  271410
MAHSHIE & DECOSTA, P.A.
1560 Matthew Drive, Suite E
Fort Myers FL 33907
Telephone:  (239) 931-7566
Facsimile: (239) 931-7560
Primary Email:      Chris@md-lawfirm.com
                            Eservice@md-lawfirm.com
Secondary Email:  Jamie@md-lawfirm.com
                            Kamalee@md-lawfirm.com

## CERTIFICATE OF SERVICE

I, CHRISTOPHER J. DECOSTA, HEREBY CERTIFY that on this 7th day of February 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

By**:** _/s/ Christopher DeCosta_____

23